1817.

RIGGS
v.
MURRAY

*RIGGS and others, assignees of R. MURRAY, a bank-
rupt, *against* J. B. MURRAY and others.

An assignment by a debtor of all his property in *trust,* to pay the trustees,
and such other creditors as the debtor, in one year, by deed, might di-
· rect and appoint, &c., reserving a power to appoint new trustees, and
to revoke, alter, add to, or vary the trusts, at his pleasure, is fraudulent
and void.
The trustees, under such deed, were decreed to account for the proceeds
of the property received by them under the assignment, with interest,
deducting their commissions and charges.; and to be entitled only to
come in, *pari passu,* with the other creditors, for their ratable propor-
tion of the debtor's estate.

ON the 23d of *March,* 1798, *Robert Murray,* for himself,   *September* 30th.
and as attorney (duly authorized) for his partners, *George
W. Murray, John R. Wheaton,* and *James V. Murray,* made
an assignment of all their partnership property in the *United
States,* to *John B. Murray* and *John Innes Clark.* The deed
recited, that the copartners had become insolvent, and were
unable to pay their debts, and that the assignees had ad-
vanced money, and became bound for them in large sums,
from motives of pure friendship, and that they considered
themselves bound in honor to secure the assignees as far as
they were able ; and the deed also admitted, that they had
previously made several particular assignments to those as-
signees and others, for particular purposes, and for their in-
demnity. This assignment was made expressly *in trust,* to
sell, collect, and receive the property, and to apply the pro-
ceeds to the payment of the balances due to the trustees, and
to such other creditors as the assignors should, by deed, with-
in one year thereafter, name and specify ; and to *each of them,*
and at *such times* and in *such proportions,* and *on such terms
and conditions* as *they, by such deed, should direct, and in de-
fault of such direction, then in trust for the grantors,* and, fur-
ther, with power to change the trustees, &c.
On the 24th of *March,* 1798, the grantors, by deed, recit-
ing *the former deed, appointed and directed the grantees to       [ * 566 ]
pay, out of the property assigned, the expenses of the trust,
and to retain and to pay themselves, and for divers other pur-
poses therein particularly specified, several sums of money
therein specified ; reserving, however, to the grantors, a pow-
er, by a deed, at any time before a complete adjustment of
the trust, within one year, to alter or revoke the appoint-
ments.

1817.

Riggs
v.
Murray.

On the 21st of *March*, 1799, the grantors, by deed, revoked and annulled the appointments and trusts of the deed of the 24th of *March*, 1798, and appointed and appropriated the property before assigned to the payment of the charges of the trusts, and to the payment of the trustees and certain other specified creditors, such sums and in such proportions of the moneys due them respectively as the grantors should, thereafter, by deed, direct and appoint.

On the 22d of *March*, 1799, the grantors, by deed, referring to the former assignment, directed the trustees to pay, out of the property assigned, the expenses of the trust, and to pay themselves and divers other creditors, therein mentioned, the sums due them at the times, in the proportions, and upon the terms and conditions therein expressed; reserving the right and power in the grantors, by deed, at any time before a complete and final adjustment, to alter or revoke all, or any, of the said appointments and directions, and to make and declare any new appointments or trusts at their pleasure.

On the 31st of *May*, 1800, the grantors, by deed, referred to, and partly recited the former deeds of the 23d of *March*, 1798, and 22d of *March*, 1799, and recited further, that the grantors were desirous to alter the appointments made by the last of those deeds, and to make other and further appointments and directions; they did, therefore, by virtue of the power to them reserved, order and appoint, that out of the proceeds of the property assigned, the trustees should

[ * 567 ]

pay : (1.) all expenses incurred; (2.) towards *the support of the grantors from the 28th of *March*, 1798, until they should be respectively discharged from their debts, or until one year after they should be discharged by law, not exceeding 2,000 dollars a year, for each of the grantors; (3.) to pay certain creditors named; (4.) to pay themselves certain specified debts; (5.) to pay other debts due the trustees, and several other creditors therein mentioned, on a due liquidation, &c.; and, generally, to pay all persons who were or should be bail for the grantors, or either of them; (6.) that the assignees should make a final settlement with the creditors last mentioned, on certain terms mentioned, and that the assignees should hold the balance of trust property, subject to the further order of the grantors, and that the creditors who should not, within one year, accept of the conditions, or should knowingly embarrass the objects aforesaid, should be forever excluded from any share under the assignment.

A separate commission of bankruptcy was issued, on the 15th of *June*, 1801, against *Robert Murray*, who was then, and since 1796, had been in confinement, for debt. On the 2d of *July*, his property was assigned to the plaintiffs, who,

in 1802, filed their bill against the trustees, *Murray & Clark*, and making the grantors also parties. In this bill they charged, that *Robert Murray* did business in *New-York*, and the other partners went abroad to *Europe* to avoid and defraud their creditors. That *Robert Murray*, as partner, had contracted debts to upwards of 700,000 dollars; that the assignment of 1798 was fraudulent, and made to delay, hinder and defraud the creditors. The bill further charged, that the private property of *Robert Murray*, exclusive of his share in the partnership property, was very inconsiderable, and the bill prayed that the trustees might come to an account with the plaintiffs for all moneys received belonging to the partnership estate, and that they might be directed to deliver up all books, vouchers and papers belonging to the estate, or firm, and that they *might pay to the plaintiffs what they were entitled to receive, as assignees, and might assign and deliver over all securities, &c., and that the several assignments to the trustees might be declared fraudulent and void.

To this bill *Robert Murray*, *George W. Murray*, and *John R. Wheaton*, generally answered, setting forth their bankruptcy and discharge, under the bankrupt act of the *United States*.

The answers of *John B. Murray*, and *John Innes Clark*, admitted the several bills of assignment and appointment, and most of the facts charged in the bill, but denied fraud in any of the transactions. They stated, that within one year from the date of the last deed, certain creditors therein named, and the trustees themselves, did agree and assent to the terms expressed. That the four first deeds were delivered to the defendant *Clark*, and were, afterwards, mislaid and lost. That *Robert Murray* acted as agent for the trustees, in several matters relating to the trust. That the property assigned was greatly deficient in paying the debts covered by the assignments. That *James V. Murray*, one of the partners, claimed the funds received by the trustees, and had filed his bill for that purpose. The trustees stated the amount received, and submitted to account, and pay the balance, if any, &c.

*Clark* died after putting in his answer, and the suit was revived against his executors; and in *August*, 1809, a settlement took place between the plaintiffs and the executors of *Clark*, with the assent of *John B. Murray*, and of all other parties concerned, and a rule was entered, by consent, on the 2d of *August*, 1809, stating the agreement, and that the plaintiffs had agreed to receive the balance of the trust property due from the estate of *Clark*, after deducting all moneys justly due to him, and intended to be secured by the as-

*Margin:* 1817.

Riggs
v.
Murray.

[ * 568 ]

1817.

RIGGS
v.
MURRAY.

[ * 569 ]

signments, and all moneys paid by him, in good faith, on account of the trust. That the balance was to be paid in real property, at a fair valuation, and in full discharge of what *Clark* was *liable for, without waiting for a final decree as to the trust property, in the hands of the defendant *John B. Murray*, or as to the rights of the several claimants on the trust fund. The rule further specially provided, that the plaintiffs were not to be precluded from litigating the validity of the assignments, so far as respects all objects and purposes, except the estate of *Clark ;* and it was further agreed that the defendant *John B. Murray* was to account for the trust property which came to his hands ; and that if it should be determined, that the deeds were valid, as to all or any of the *cestui que trusts*, that then, after applying to the payment thereof, the balance, if any, in the hands of *John B. Murray*, after deducting his *bona fide* payments, and the sums due to him, and to the house of *Murray & Mumford*, the residue due to such *cestui que trusts* should be made good out of the funds to be derived from the executors of *Clark*.

The balance due from the executors of *Clark*, under the rule, was duly ascertained, and reported to be 78,328 dollars and 55 cents ; and it was discharged by a payment to the plaintiffs of 6,000 dollars in cash, and the residue in lands, conveyed to the assistant register of the Court, subject to the orders of the Court, and the executors were consequently discharged.

The cause, as to *John B. Murray*, proceeded to issue and publication, but no proof was taken on either side.

On the 16th of *October*, 1812, a rule was entered, by consent, referring it to the master, to take an account of the moneys received by the defendant *John B. Murray*, as trustee aforesaid, and of the sums paid or retained by him, and which ought to be allowed him, in pursuance of the deeds of trust, and the particulars of such receipts, payments and allowances, and *that all questions be reserved*.

[ * 570 ]

The master reported, on the 1st of *July*, 1816, that he had been attended by both parties, and that the defendant *John B. Murray* had received, under the trust, *81,836 dollars and 99 cents, " after deducting all charges and commissions which accrued thereon ;" that there was due to him, and to the firm of *Murray & Mumford*, under the assignment, after crediting all he had received for principal and interest, on the 1st of *September*, 1814, 95,688 dollars and 25 cents, and which, with interest to the date of the report, amounted to 102,548 dollars.

The plaintiffs excepted to the report, on the ground that the defendants, *John B. Murray* and *Murray & Mumford*, 442

did not, nor did either of them, appear, by any thing in evidence before the master, to be entitled to be paid out of the property assigned, &c.

1817.

Riggs
v.
Murray.

The cause came on to be heard in *June* last, on the final equity reserved; at the same time, the petition of the defendant *John B. Murray* was read, stating his rights under the assignment, and the history of the cause, and praying for an order that the plaintiffs pay to him the 6,000 dollars received by them from the executors of *Clark*, and that the lands conveyed to the assistant register may be conveyed to him, or sold, and the proceeds to be paid to him, and that such sale be at the expense of the plaintiffs, if they wish a sale, and the funds should eventually prove deficient.

*Harison*, for the plaintiffs.

June 16th and 17th.

He stated the following points:

1. That the several assignments were fraudulent and void, as appeared from the answer of the defendant *John B. Murray*, and upon the face of them.

2. That the money received under the assignments, in the hands of *John I. Clark*, at the time of his decease, and the amount received by *John B. Murray*, and stated to have been paid over to *Murray & Mumford* and others, belonged to the plaintiffs, in trust for all the creditors.

The badge of fraud in the assignment of 1798, was the \*clause of revocation; and though fraud be denied in the answer, and there be no proof of fraud in fact, (for which he did not contend,) yet if the deeds, from the face of them, and from the circumstance attending them, were, in judgment of law, fraudulent, they ought not to be permitted to stand.

[ \* 571 ]

That if the assignments were made in contemplation of bankruptcy, they were fraudulent, because made to defeat an act which passed in *April*, 1800, and which the grantors knew was to be in operation the day after the deed of the 31st *May*, 1800. He cited 15 *Vesey*, 449. 3 *Johns. Rep.* 71.

*N. Pendleton, D. B. Ogden,* and *S. Jones, jun.*, contra.

They submitted the following points:

1. That the defendant having denied the allegations of fraud, and no proofs being taken in the cause, and there having been a reference, by consent, to ascertain the amount due under the assignment of the 31st of *May*, 1800, no question can exist as to its validity, or the defendant's rights under it.

1817.

RIGGS
v.
MURRAY.

2. That the defendant is entitled, for *Murray & Mumford,* to the lands conveyed and the moneys paid to the plaintiffs by the executors of *Clark.*

3. That the other defendants ought to be dismissed with their costs, having been discharged under the bankrupt act.

They contended that the assignment of 1798 was valid: that preference may be given by an insolvent debtor: that the *bona fide* debts due the trustees, more than exhausted the property assigned: that the defendant was entitled to be paid, under the assignments, his private and partnership debts: that *Robert Murray* was not a bankrupt until *June,* 1801, and that no deed could be void under the bankrupt act, unless it was, of itself, an act of bankruptcy. 1 *Burr.* 467.

*September* 30th.    The cause stood over for consideration until this day.

[ * 572 ]    *THE CHANCELLOR. The material question in the case is, whether the deed of assignment, of the 23d of *March,* 1798, was not, in judgment of law, fraudulent, as against the creditors at large. That was the only deed that assigned the partnership property; the subsequent deeds, between the same parties, including the one of the 31st of *May,* 1800, were merely directions to the trustees, founded upon that original deed of assignment. If that deed was void, the succeeding deeds must share its fate, as they were incidental to, and dependent upon it. They were all connected parts of one transaction.

There were five deeds between the parties, bearing date successively, on the 23d of *March,* 1798, the 24th of *March,* 1798, the 21st of *March,* 1799, the 22d of *March,* 1799, and the 31st of *May,* 1800. They have all been mislaid, lost, or destroyed, except the last, which is made an exhibit in the cause, and from the recitals in that deed, and from the answers of the defendants *J. I. Clark* and *J. B. Murray,* we are enabled to ascertain the contents of the four lost deeds.

It appears that by the deed of the 23d of *March,* 1798, *Robert Murray & Co.* assigned all their partnership property in the *United States,* to *Clark & Murray,* in trust. The inducements to the assignment are contained in the recitals in that deed; by them it appears that the house of *Robert Murray & Co.* had become insolvent, and that *Clark & Murray,* and others, had advanced moneys and become bound for them in large sums, from motives of friendship; that in consequence thereof, they considered themselves bound in honor to secure these creditors, as far as they were able. The deed further recited, that *Robert Murray & Co.*
444

had, before that time, made several particular assignments of particular subjects, to *Clark & Murray*, separately and jointly, for particular purposes, and for their indemnity, &c. The deed then granted and assigned the subjects previously assigned, and the excess *thereof, and their several books of account, and legers, and certain debts and property particularly specified, to *Clark & Murray*, and to the survivor, in trust, to sell, collect, and receive the property, and to apply the moneys in payment and satisfaction of the debts and balances due to *Clark & Murray*, and to such other creditors as the grantors, by deed, within one year, should designate, and to each of them, at such times, in such proportions, and upon such terms and conditions, as the grantors, by such deed, should direct; and in default of such direction and appointments, in trust for the grantors. The deed also reserved a power to the grantors, in case they were dissatisfied with the trustees, to appoint others, with or instead of the trustees therein appointed, who were to be subject to the same trusts.

This assignment, as it plainly appears from the instrument itself, was made subject to the future direction and control of the assignors, and liable to be revoked and annulled at their pleasure. The payment of the debts due to *Clark & Murray*, as well as to the other creditors, to be named and specified, was equally subject to the power of future control and revocation. The payments were to be made in discharge of the debts due to *C. & M. and to such other creditors* as should be thereafter specified, and then the subsequent words, *and to each of them, at such times, in such proportions, and on such terms*, &c., are to be applied, *reddendo singula singulis*, equally to the creditors named, and thereafter to be named. This is the natural and grammatical construction and meaning of the sentence. The power also reserved, to change the trustees, shows, that the grantors intended to retain to themselves the entire control of the deed of trust. As trustees, *C. & M.* were made subject to removal; and as creditors, they appear to have been placed on an equal footing with other creditors coming in under the deed, and the substituted trustees (if any had been named) would certainly have considered *them as not entitled to any preference, and would have dealt with them as they dealt with the other creditors named, *subject to the future dispositions and directions of the grantors*.

The subsequent deeds show, conclusively, the sense of the parties on this subject, and that the payment of the debts due to *Clark & Murray*, as well as to others, was to depend on the future direction of the grantors.

The next deed was dated the 24th of *March*, 1798, or the

445

1817.

RIGGS
v.
MURRAY.

[ * 573 ]

[ * 574 ]

1817.

Riggs
v.
Murray.

day following the original deed of assignment. It recited that deed, and the trusts of it, and then, by virtue of the power reserved, it directed *Clark & Murray* to retain and pay the expenses of the trust, and, also, *to retain and pay to themselves,* and for divers other purposes therein specified, several sums therein mentioned, reserving still the power, by deed, at any time before a complete adjustment of the trust, within one year to be made, *to alter, revoke, add to, or vary, the said appointments.*

We come next to the deed of the 21st of *March,* 1799. That deed revoked and annulled, to all intents and purposes, the appointments and trusts of the deed of the 24th of *March,* 1798, and appointed and appropriated the property before assigned, to the payment of the expenses of the trust, and then that the trustees *should retain and pay to themselves, and to certain other persons therein mentioned,* such sums, and in such proportions, *as the grantors should at any time thereafter, by deed, direct and appoint.*

The fourth deed, of the date of the 22d of *March,* 1799, contains a very explicit and entire control over the whole assignment of 1798, and as well of the payments to be made to the trustees, as to the other specified creditors. It recited the original assignment, and the powers therein reserved, and then directed the trustees to retain and pay, out of the proceeds of the property assigned, the expenses of the trust, and then *to retain and pay to themselves, and to divers*

[ * 575 ]

*other creditors, the debts owing to them, and to *such other creditors, in the manner, at the times, in the proportions, and upon the terms and conditions therein expressed.* By this deed the grantors also reserved to themselves full power, by any other deed, at any time before a complete and final adjustment should be made, *the said, and first before mentioned instruments,* (referring to the first deed of 1798,) *to alter, and revoke all, or any part of the said directions and appointments, and to add to and make any further and other directions and appointments,* &c.

We come, lastly, to the deed of the 31st of *May,* 1800. That deed recited the substance of the original deed of assignment, and of the declaration of trust of the 22d of *March,* 1799, and then recited that the grantors were desirous to alter the directions and appointments in the last deed, and to make others. They accordingly direct the trustees, out of the property originally assigned, to pay the expenses of the trust, then to pay, not exceeding 2,000 dollars a year, to each grantor towards his support, next to pay certain creditors in *England,* and, fourthly, to retain and pay the debts due to themselves, and the house of *Murray & Mumford,* as

446

therein specified, and also to pay certain other creditors, &c.

There is no further express reservation in this deed, of a power of revocation. The grantors seem, at last, to have grown weary of sporting with the property as their own. It may be doubted, however, whether the power of revocation in the prior deed was not still in force. It was to continue until a complete and final adjustment of the accounts, and whether such an adjustment took place before the act of bankruptcy committed, does not appear from the case. This last deed proves, beyond contradiction, that the assignment of 1798 was as much under the control of the grantors, in respect to the payment of the debts due to the *trustees*, as in respect to the payment of any other creditors. The deed was made between *Robert Murray & Co.*, of the first part, *Clark & Murray*, as trustees, *of .the second part, *and the said parties of the second part as creditors, and all such other creditors who should become parties to the deed, by executing it, or otherwise consent to its conditions, of the third part.* It appears that *Clark & Murray* did, as creditors, become parties to this deed, by also executing it ; for it was made upon this express condition, that the parties of the third part should accede to the terms of the deed, by becoming parties to it, and that those who should refuse or neglect to accept of the conditions annexed to the deed, respecting the credits, &c. within one year, should be forever excluded from the benefit of its provisions.

This last deed professed to be nothing more than a declaration or appointment of trusts, created by the first deed of 1798, and founded on the powers reserved in that and the subsequent deeds. It was not, of itself, any assignment or transfer of the property. It referred to the deed of 1798, as the only subsisting title or assignment, and if that deed be removed, or declared void, the whole superstructure falls to the ground.

It may, also, be assumed, as a clear and undisputed fact, that, whether these deeds be viewed separately, or taken (as they ought to be) in connection, as parts of one whole, and forming one entire act, they were made subject to the future disposition and power of the grantors, as well in respect to the debts due to *Clark & Murray*, as in respect to the debts of the other creditors, alluded to in those deeds. This leads us to the consideration of the important question arising out of this case, whether such an assignment, by an insolvent debtor to a few select creditors, with such a power of revocation attached to it, can be deemed valid in law. The necessary inference seems to be, that it was made " to

1817.

RIGGS
v.
MURRAY

[ * 576 ]

Though assignments in trust, with a power of revocation, may be good in family settlements, yet

1817.

RIGGS
v.
MURRAY.

[ * 577 ]

a power of revocation, reserved by a debtor, in an assignment of his property to pay certain creditors, renders the instrument fraudulent and void.

delay, hinder, or defraud creditors." Family settlements may often require such powers of revocation, to meet the ever-varying interests of family connections; but it is difficult to perceive a proper motive *in a debtor who means nothing more or less than the payment of a debt, to reserve, in the very instrument of assignment, a right to recall the payment. The only effect of such an assignment is to mask the property. If tolerated, it would become an inlet to fraud, and lead to all imaginable abuse. Insolvent debtors are, no doubt, permitted to give preferences, where no legal claims exist, and to pay one creditor to the exclusion of another; but this has not a very extensive application in the *English* law, for it is controlled by the operation of their bankrupt system, in which equality is equity, and preferences are forbidden. If the rule was not thus checked in practice, and confined to cases which usually do not relate to commercial dealing, I much doubt whether it would have been so long endured in the *English* administration of justice. The rule in chancery, when property is placed under the jurisdiction of that Court for distribution, has always been

In equity, the rule of distribution is equality, and creditors are paid, *pari passu*, in ratable proportions.

different; the creditors are paid, *pari passu*, in ratable proportions, and the same rule is adopted in all our statute distributions of property for the payment of debts. "It is founded on this," says Lord *Talbot*, "that, by natural justice and conscience, all debts are equal, and the debtor himself is equally bound to satisfy them all."

The doctrine of equality in payment prevails also in the bankrupt system in *France*, ( *Code de Commerce*, art. 443. 558.) and all partial assignments, by an insolvent debtor, are considered in that country as fraudulent and void.

Where there is no bankrupt law, the principle of which is equality among creditors, an insolvent debtor may prefer one creditor to another; but such preference is to be viewed with

[ * 578 ]

jealousy, and should be strictly construed, so as to guard against abuse and fraud.

As we have no bankrupt system, the right of the insolvent to select one creditor, and to exclude another, is applied to every case, and the consequences of such partial payments are extensively felt, and deeply deplored. Creditors out of view, and who reside abroad, or at a distance, are usually neglected. This checks confidence in dealing, and hurts the credit and charatcer of the country. These partial assignments are, no doubt, founded, in certain cases, upon meritorious considerations; yet the temptation *leads strongly to abuse, and to the indulgence of improper motives. The master of the rolls, in *Small* v. *Oudley*, (2 *P. Wms.* 427.) and the lord chancellor, in *Cock* v. *Goodfellow*, (10 *Mod.* 489.) admit that such preferences, by a sinking debtor, may, and, in certain cases, ought to be given, and are called for by gratitude and benevolence; yet, at the same time, it is acknowledged that the power may be abused, and be rendered subservient to fraud. Experience shows, that preference is

418

sometimes given to the very creditor who is the least entitled to it, because he lent to the debtor a delusive credit, and that, too, no doubt, under assurances, of a well-grounded confidence of priority of payment, and perfect indemnity, in case of failure. How often has it happened, that that creditor is secured, who was the means of decoying others, while the real business creditor, who parted with his property on liberal terms, and in manly confidence, is made the victim. Perhaps some influential creditor is placed upon the *privileged* list to prevent disturbance, while those who are poor, or are minors, or are absent, or want the means or the spirit to engage in litigation, are abandoned.

The grantors mentioned, in their deed of 1798, that they were bound *in honor* to secure the two assignees; this would seem to imply that they were not equally bound in honor to pay all their just debts. The notion of honorary debts, in contradistinction to the other debts, founded on fair and adequate consideration, is a dangerous distinction, and calculated to injure or mislead the moral sense. The law does not recognize such a principle of honor, and we have no means by which we can test its purity, or separate it from arbitrary, selfish, or vindictive motives of preference. The principle is too uncertain, flexible, and capricious in the application.

I do not question the legality, however I may doubt the policy, of the rule which sanctions such partialities. It has been long established, and the authorities to this point *were referred to by me, in the case of *Hendricks* v. *Franklin*.† I mean, however, to be understood, that the application of the rule is always to be watched with jealousy, and that we are not required, by any reasons of expediency or justice, to enlarge the rule by giving it a new and dangerous facility. We ought to require of the insolvent, when he undertakes to make preferences, by assignments in favor of a class of honorary or privileged creditors, that he should do it absolutely and definitively, and not make the assignment to depend upon his future will and pleasure. Such a reservation gives an alarming aspect to the assignment, and betrays some forbidden or lurking design. I have no difficulty, therefore, in considering the deed in question as colorable merely, and fraudulent in respect to the general creditors.

That such powers of revocation are fatal to the instrument, and poison it throughout, appears to have been well established by authority.

The statute of 27 *Eliz.*, and which we have re-enacted, (Sess. 10. ch. 44. s. 5.) declares all grants of land, with power of revocation, void, against subsequent purchasers, for a valuable consideration. In *Tyrer* v. *Littleton*, (2

1817.

Riggs
v.
Murray.

The law recognizes no distinction among creditors, or of such debts as are *honorary* or *privileged* to be paid before others.

[ * 579 ]
† *Ante*, p. 283.

1817.

RIGGS
v.
MURRAY.

[ *580 ]

[ *581 ]

*Brownl.* 190.) *Winch*, J., said, that a deed with power of revocation, was apparent fraud by the statute, and the Court might take notice of it without averment. The meaning of that opinion was, that such a deed is fraudulent in law, and that there is no need of proof of fraud, in fact. So it was said in *Twine's* case that the statute had put voluntary estates, with power of revocation as to purchasers, on the same footing with conveyances made by fraud. Such a power in a conveyance is recognized by that statute, as a clear and distinct mark of fraud; and that, and the other statutes of fraud, were only declaratory of the known principles of the common law.

The law is so jealous on this subject, that if the deed contains a power in any way equivalent, in its effects, to a *power of revocation, it is fatal. Thus, in *Lavander* v. *Blackstone*, (2 *Lev.* 146. 3 *Keb.* 526. pl. 11.) it was held by the K. B. that a conveyance by an insolvent debtor, in trust to pay debts, was fraudulent, because, among other things, it had a proviso, enabling the grantor to make leases for any term, without rent, and this was considered as putting it in his power to defeat the whole settlement, for *though the consent of the trustees was necessary*, yet they were trustees of his own nomination. So exceedingly strict and scrupulous was the K. B. on this point.

But the case which comes nearer to the one before me, is that of *Tarback* v. *Marbury*. (2 *Vern.* 510.) The defendant there made a conveyance of his estate to trustees, to the use of himself for life, and with power to mortgage the same, the remainder to the trustees to sell and pay his debts. The question was, whether creditors by subsequent judgment must submit to come in under this deed of trust, and the lord keeper held the deed fraudulent, because, the defendant having reserved to himself a power to mortgage and charge the estate with sums he thought fit, he might have charged it to the full value, which amounted, in effect, to a power of revocation, which rendered it fraudulent against the creditors.

A reservation of a part of the interest to himself, as in that case, and in the one of *Estwick* v. *Caillaud*, (5 *Term*, 420.) does not destroy the provision in respect to the residue, though if the part unreserved be deficient, the creditors might, perhaps, apply to a Court of equity for the residue. But if the power enables the grantor to defeat the whole provision, all the cases concur in declaring it null and void.

The principle established in these cases is perfectly applicable to the deeds before us. The only difference, if any, is, that the mischiefs and frauds to which the power of revocation may be made subservient, render the rule *more

450

valuable, and more indispensable, in the disposition of personal estate.

The assignment of property, in discharge of a debt, is a very simple transaction; yet the one in this case was wonderfully complex. There were five deeds, all relating to one subject, and annulling each other in rapid succession. Nothing is pretended to have been done, between *March*, 1798, and *May*, 1800, that was stable or definitive. The case is destitute of that simplicity which attends fair and ordinary dealings. To sanction such transactions in a debtor, who was at the time avowedly insolvent, and professing to make partial dispositions of his property, would be dangerous, and is inadmissible upon principles of policy as well as of law and justice. The last deed was poisoned by its connection with those that preceded it, and by the aliment which it drew from them.

Even if the deed of the 31st of *May*, 1800, was to be considered independently of those which preceded it, it was so clogged with conditions and provisions in favor of the grantors, as to be unfit to be sanctioned as a valid partial assignment.

It was made to depend, in the first place, upon the agreement of the grantees, and of the other specified creditors, within the space of twelve months, to all its conditions. One of the earliest provisions in the deed, and which had preference to all others, except the one relating to the expenses of the trust, was to allow to each of the insolvent grantors a sum not exceeding 2,000 dollars a year, for their support and maintenance, from *March*, 1798, "until they should be completely released and discharged from all their debts, or until twelve months after they should have secured such release and discharge by law." Another condition was, that the specified creditors were to give "security to use all means in their power to render the property, lodged in trust with them, productive, &c." It was, finally, added, that "if any of the persons intended to *be parties of the third part," (and which of course included the grantees, *Clark & Murray*,) "should, at any time, knowingly and wilfully embarrass, or attempt to injure the objects therein contained, such party should be forever excluded from a share or participation therein."

[ * 582 ]

If an insolvent debtor may make sweeping dispositions of his property, to select and favorite creditors, yet loaded with such durable and beneficial provisions for the debtor himself, and encumbered with such onerous and arbitrary conditions and penalties, it would be impossible for Courts of justice to uphold credit, or to exact the punctual performance of con-

**1817.**

RIGGS
v.
MURRAY.

The trustee under an assignment fraudulent and void, though a creditor will be ordered to account for all the property received under the assignment, with interest, deducting his commissions and costs, and to come in, *pari passu*, with the other creditors, for his ratable proportion of the debtor's estate.

[ * 583 ]

tracts. It will not, therefore, be in my power to give to the defendant *John B. Murray*, any aid under the assignment; and his petition, for the property received by the plaintiffs from the executors of *Clark*, must, of course, be denied.

The next question is, whether I ought not go further, and make the defendant account for the property he has received under the assignment, and place *that* also in the hands of the plaintiffs, for general and equal distribution. I do not see any principle that will justify me in denying to the plaintiffs the full object and entire equity of their bill. The defendant ought not to be permitted to avail himself of any advantage over the other creditors under an assignment fraudulent on its face, and to which he, no doubt, lent his voluntary sanction from the beginning. If the assignment was void, as against the general creditors, the title of the defendant to the property which he received under it fails. He came by it wrongfully, and to permit him to hold it, by setting off his own debt against it, would be giving effect to a transfer condemned in law. It cannot be done without a sacrifice of the principle. The doctrine of set-offs is founded in natural justice, and never was applied to a case where the party came by property wrongfully. He can no more be allowed his set-off against property acquired by a fraudulent deed, than if he had acquired *it tortiously ; and though the grantor himself might be estopped from recalling the property, yet his assignees under the bankrupt act represent the creditors at large, and are not so concluded. If the defendant is entitled to be paid under the assignment, the other creditors who were specially named in it, have, at least, equal, if not superior pretensions, and we should thus confound all distinction between one kind of assignment and another, and render the conclusions of law vain and nugatory. I cannot perceive any other alternative, but either to give complete effect to the assignment as a fair and valid instrument, free from any noxious quality, or to make the defendant account for the property he received under it. The latter is the proper conclusion. It gives triumph to principle, and becomes, as a precedent, beneficial hereafter.

The great amount of the property in question, is a circumstance I have felt, and it has awakened much anxiety in the consideration of the case. But, it must not, and cannot, affect the operation of established principles. Having satisfied myself that it is legal and just, it then becomes a duty to make the defendant account for the property he received under the assignment. He will still stand on an equal footing with the general creditors, and be paid in a ratio, to the amount of his debt. He may lose part of his

452

demand by this means, but he will be placed upon an equality with other creditors, whose demands are equally just, and equally necessary to them, and who must lose in the same proportion.

It is scarcely necessary for me to add, (though it was made a point on the part of the defendant,) that there is nothing in the proceedings which excludes the plaintiffs from the full assertion of their rights. The settlement with the executors of *Clark*, (and with which this Court had no concern,) was made under an express reservation, acceded to on the part of the defendant *John B. Murray*, of the right to litigate with him the validity of the assignment; *and in the rule, referring, as a provisional measure, the accounts of the defendant to a master, all questions were reserved. This is the first time that the validity of that assignment, and of the deeds dependent upon it as incidents, has been submitted to the consideration of the Court.

I shall, accordingly, decree, that the defendant *John B. Murray* account to the plaintiffs, for the 81,836 dollars and 97 cents, which, it appears by the master's report, was the net sum, after deducting charges and commissions, which he had received under the assignment; and he must account for that sum, with interest from the date of the report, and with costs of suit. The bill, as to the other defendants, is dismissed without costs.

Decree accordingly.<br>453