Gardiner, J.
— The only question which I -* propose to consider is, whether a provision, authorizing a credit, in the discretion of the trustees, upon the sale of the property, avoids the trust as to the complainant, a judgment-creditor.
*471 One of the express trusts authorized by statute is, “to sell lands for the benefit of creditorstrusts of personal property are tolerated by our law, for the same object. The power to create a trust of real or personal property, or, as in this case, of both, must be construed in the light of other provisions of the common law and the statutes of this state. One of these statutes prescribes, that every assignment of any interest in lands, goods or things in action, made with intent to hinder, delay or defraud creditors of their lawful suits, damages, debts or demands, shall, as against the persons so hindered, delayed, &c., be void. (2 R. S. 137, § 1.) Another, that all assignment of goods, &c., in trust for the use of the person making the same, shall be void as against creditors, existing or subsequent, of such persons. (2 R. S. 135, § 1.)
These statutes are but expositions of the common law (2 Cowp. 432), which, in addition, imposes upon the debtor the obligation to pay his debts as they become due. These various provisions of law must stand together, and each should be so interpreted, as to preserve the rights of the debtor, without essentially affecting his obligations to his creditors. The legislature have conferred *upon the debtor the right to create a trust of his property for certain purposes; he may also *- prefer one creditor to another. Of course, the “ delay” to creditors, necessarily resulting from a fair exercise of these rights, is not prohibited by any statute j[1] but this delay must be incidental, and necessary to the existence of the trust, or the exercise of the power. Where it becomes the principal motive for the creation of the one, or the exercise of the other, the conveyance made and thing done in pursuance of such intent, if any injury does or thereby may result to creditors, is prohibited by statute, and may be avoided, at their instance.
Nothing beyond this was determined in Meux v. Howett *472 (4 East 1) and in Wilder v. Winne (6 Cowen 287) and other cases to which we have been referred. In the first case, Lord Ellenborough said, “the statute was meant to prevent deeds, &c., fraudulent in their concoction, and not merely such as, in their effect, might delay or hinder creditors.” And in the last, it was held, that it could not be left to a jury to decide whether an execution was issued upon a bond fide judgment, with an intent to delay other creditors, that such must necessarily have been the intent, the property being insufficient to pay both judgment-creditors. Both of these were cases of preference by means of judgments confessed to bond fide creditors, who had issued executions and levied upon the insolvent’s property. The delay, in each case, to other creditors, was the necessary result of the preference given, and for that reason lawful.
Indeed, these authorities, and others of the same class, are not distinguishable in principle, from a case in which an insolvent, owing debts of an equal amount, to two different creditors, with money sufficient to discharge one only, and no other property, pays one demand in full, and omits the other intentionally. No one would imagine, in the instance supposed, that the debtor and the fortunate creditor, one or both, were liable in a penal action for fraud. The payment of one demand, although the debtor happened to owe two, was right in itself, and precisely what the law required; and although the parties may have ^foreseen, and intended, that other -1 creditors should be delayed, the delay would be the incidental consequence of an act perfectly just and legal. But let’ us suppose, that the debtor owed but one debt, and had transferred his property with intent to hinder and delay that creditor, although but for a day, the assignment, if it could have that effect, would be fraudulent and void. The same would be true of a trust, giving preferences, but intended to hinder and delay other creditors. In these cases, the motives for creating *473 the trust, and the purpose to be effected by it, would be illegal; the delay, instead of being incidental, would be the primary object to be accomplished by its creation ; such an intent, whether manifested by an open or secret trust, avoids- the conveyance. There is no case to the contrary, nor can there be, without a repeal of the statute.
It was argued, that an “intent to hinder and delay creditors, there being no Intent to defraud them, will not make an assignment illegal; a positive intent to defraud must exist.” The answer to this suggestion is, that a positive intent to defraud always does exist, where the inducement to the trust, is, to hinder and delay creditors, since the right of a creditor to receive his demand, when due, is as absolute, as the right to receive it all. It has always been understood, that where an individual has incurred an obligation to pay money, the time of payment was an essential part of the contract; that when it arrived, the law demanded an immediate appropriation by the debtor, of his property, in discharge of his liability, and if he failed, would itself, by its own process, compel a performance of the duty. The debtor, by the creation of a trust, may direct the application of his property, and may devolve the duty of making the appropriation upon a trustee; this the law permits, and such delay as may be necessary for that purpose. But the debtor cannot, in this way, avoid the obligation of immediate payment, nor extend the period of credit, without the assent of the creditor; the attempt to do this, however plausible may be the pretence, is, in conscience and in law, a fraud and nothing else. It is the fraud *which we are asked to sanction, by upholding the trust in question. [*518
These insolvent debtors have authorized their trustees, according to their discretion, to sell the assigned property upon credit. They are to determine when the purchasers shall pay, and of course, when the creditors *474 shall receive their dividend; their power amounts to this, as we shall see, if it amounts to anything. It is hardly necessary to say, that what the debtors could authorize, they could direct to be done; and they could have prescribed the period for the credit in the trust-deed. Their power in this respect, upon the principles assumed by the court below, is unlimited, if exercised in good faith. The whole argument, independently of authority, in favor of this extraordinary power, resolves itself into this, that without it, the property of the debtor may be sacrificed, and creditors thereby injured. To this it may be answered, if the trust property is not readily convertible into money, the debtor may dispose of it himself; he is under no obligation to assign. It was not the object of the legislature, as the late chancellor remarked, “ to hold out inducements to a debtor in failing circumstances, to place his property beyond the reach of creditors.” (7 Paige 274.)
In the second place, if the property is more than sufficient to discharge all the debts of the assignor, he has no right to delay creditors, by giving credit on the sale of the property, with a view to increase the surplus resulting to him; this would be a trust for his own benefit, and, consequently, void, by the first section of the “ act against fraudulent conveyances.” (7 Paige 37.) If the property is sufficient to pay the demands of creditors, it is obvious, that they are chiefly interested in the amount to be realized by the sale. As they must sustain the loss, if there is a deficiency, they should have the right to be consulted, and to determine whether their interest ' will be better subserved, by a smaller sum presently received, or a larger one, at a future period. The rights of the debtor are sufficiently guarded, by the privilege, which the law gives him, of intrusting the sale of his property to trustees of his own selection; that *they will consult his interest, whoever else may ü y -> suffer, is demonstrated by all past experience.
*475 Again, the practice of chancery in reference to receivers, and the law authorizing a credit, by certain statutory trustees, administrators, &c., upon the sales of property on account of creditors, have been cited, to sustain the views of the respondents. But all these are officers of the law, and not the representatives of the debtor; they are trustees, it is true; but their duties are defined by the court, or written in the statute. Besides, the grant of the power in express terms, in the cases mentioned, is evidence that, in the opinion of the legislature, such an authority could not be implied from a mere power to sell, which is the proposition to be established, to sustain this assignment.
Neally v. Ambrose (21 Pick. 185) and Hopkins v. Ray (1 Met. 79) merely determine, that the provisions of the particular trusts then before the court, gave to the assignees authority to sell on credit, not that it would be implied from the grant of a power to sell. In Hopkins v. Ray, the trustees were authorized “to sell and dispose of the goods, in such manner, as they should think most advisable, within one year.” They thought it advisable to sell on credit, and it was held, that they could not be made personally responsible, although the trust was void by the law of Massachusetts. The terms of the assignment in the other case, were equally strong; in neither of them was the validity of the trusts themselves in question, and in both, the plaintiffs were attaching-creditors, not creditors by judgment.
In Rogers v. De Forest (7 Paige 278), the chancellor observed, “ that the express power to sell on credit, in that case, was a power which is usually implied in trusts of that description, and was not a violation of the revised statutes relative to uses and trusts.” And yet, singularly enough, he remarks in the same opinion, that he was “ satisfied it was never the intention of the legislature, to vest the legal estate in trustees under the first subdivision of the 53d section, for any other pur *476 pose than, that" of an immediate sale for the benefit of *520 1 crec^ors” *The ground upon which this -* learned jurist upholds a trust to sell on credit, is, that the securities taken for the property sold, may, by order of the court, be at once converted into cash; this is also the opinion of the superior court, who seem to have adopted the doctrine and reasoning of the chancellor. But if the debtor can legally direct the trustees to give credit on the sale, it is because the law clothes him with a discretion to determine, whether a future payment will, or will not, be advantageous to his creditors. The court of chancery cannot control that discretion, nor deprive the creditors of the benefit resulting from its exercise, by compelling the trustees to sacrifice the securities taken from the purchasers, in order to raise money for immediate distribution.
This is true of an assignment like the present, where the assignees are clothed with a discretionary authority by the author of the trust. It is, in each case, a question of power under the statute; if the debtor can create such a trust, equity cannot interpolate a provision, that the fund shall be disposed of, and the money realized, according to the discretion of a chancellor. A debtor, for example, or assignee under his authority, determine, as the late chancellor assumes they rightfully may, that the real estate of the insolvent, sold on a credit of two years, will produce $1500, which, if sold for cash, would yield but $1000; that $1500, divided among the creditors, at the end of that period, would be more for their advantage than $1000 presently distributed; he frames a trust accordingly. The trust is valid, and yet a court of equity that could not compel the trustees to dispose of the land for cash, can yet deprive the creditors of the advantages of a future payment, by compelling the trustee to sell the bond and mortgage received for the real estate, to a broker, for $1000 in cash, for present distribution. Indeed, the reason assigned by the chancellor for *477 upholding the trust, is, in substance, because the court of chancery can annul it at pleasure. I deny, that courts possess any such power; if the trust is valid, they are bound to enforce, and not defeat *it. That a power of f t this kind, vested in a debtor, would be most *- dangerous, the chancellor impliedly admits, in claiming jurisdiction to modify and regulate its exercise; its liability to abuse is, to my mind, a sufficient reason against implying its existence. The same considerations, which made the legislature require an immediate sale, require an immediate payment also; a discretion may be as judiciously exercised in postponing the time of sale of property, as in postponing the time of payment.
In opposition to the authority cited by the respondents, reference may be made to the observations of the chancellor, in Hart v. Crane (7 Paige 38) and in Meachem v. Stearnes (9 Id. 405); to the decision of the supreme court of the second district, in Burdick v. Post (12 Barb. 168), and to Barney v. Griffin (2 N. Y. 365). No member of the court dissented from the opinion of Judge Bronson, upon this point, in that case, although no decision was made upon it, because none was necessary to the determination in that suit.
The judgment of the superior court must, therefore, be reversed, and the assignments, containing the provision as to credit, declared fraudulent and void as to the complainants.
Edmonds, J.[2]
— The question is presented in this case, simply and nakedly, whether a voluntary assignment, by a debtor in failing circumstances, is void, b.y reason of its containing a clause, authorizing the assignee to sell the assigned property, on credit.
I should be inclined to consider the decision of the supreme court, in Burdick v. Post (12 Barb. 168), and *478 the ruling of this court, in Barney v. Griffin (2 N. Y. 371), as decisive of the question. I have no means of going behind the report of these cases, to inquire into the private opinions of the members of the court; and if I had, I should be reluctant to do so, lest I might be regarded as sanctioning a course that may tend to unsettle and weaken the authority of the court of last resort. So far as the record of the case, made by the authorized officers of the state, may, in its language, give rise to doubts or criticism, it becomes a perfectly legitimate subject of inquiry; but when that record is sufficiently explicit, on its face, I cannot feel myself at liberty to impair its just force, by any private cross-examination of the members of the court, or by any private and irresponsible statement of theirs, in conflict with the plain import of their official languge.[3]
As, however, the authority of the decision of this court has been questioned by the inferior tribunal, whose judgment we are now considering, and has been fully discussed in the argument before us, it will be as well to reiterate it here; and, if practicable, in language too explicit for doubt, our entire concurrence with the ruling on this point, in both of the cases referred to.
For more than thirty years, our courts have been struggling to keep within due bounds, voluntary assignments by failing debtors. No one can be long engaged in the administration of justice, without becoming sensible how much fraud and mischief are perpetrated, under color of such machinery. To punish a vigilant creditor; to keep the property within the debtor’s control, by means of a friendly assignee; or, to make it as available *479 to him as possible, are far more frequently the purposes of such assignments, than a fair and equal distribution of the property among those to whom it equitably belongs. And the result at which courts are bound to aim — such distribution, namely, and that as soon as practicable — is almost invariably thwarted by these assignments, and the delay and hindrance which they interpose, under the pretence of equality, and a full dedication of the debtor’s, effects to the payment of his debts. Under the name of that equality, which is equity, the means of the debtor are placed beyond the reach of his creditors, and frequently consumed in expenses and charges by the assignee, rather than in the liquidation of the debts. Such is, most generally, the practical effect of tolerating these voluntary assignments, and no one can long occupy a seat on the bench, without witnessing and lamenting it.
The only ground on which they have ever been allowed at all, is, that they do only that which every principle of honesty demands, and surrender all of the debtor’s property to the satisfaction of his debts. Yet, it most frequently is true, that they operate to withdraw that property from that legitimate purpose, at least, for a while, if not permanently, and often appropriate it to other purposes. The courts have been compelled to witness these frauds, thus perpetrated in the name of the law, until they have been constrained by a sense of duty, to aim at suppressing the evil, so far as in them lies, and at attaining that equality which is shunned under the pretence of seeking it.
From the cases of Murray v. Riggs (2 Johns. Ch. 565) and Hyslop v. Clark (14 Johns. 458), both in 1817, until this day, our courts, both of law and equity, have struggled for the attainment of this object, and have been engaged in striking down the various forms devised by the ingenuity of debtors, to pervert a rule, sounding fairly, to purposes of evil. I remember well, the effort *480 that was made in the court for the correction of errors, in the case of Grover v. Wakeman (11 Wend. 187), to relax the strict rule of the courts, and sustain these voluntary assignments, as a quasi necessary substitute for a bankrupt law. I was myself engaged in that effort, and was unwilling to extend the rule any further than it had been extended in the case of Murray v. Riggs. But after full and mature consideration, I was overruled by a very decided majority of the court; and the ruling of Grover v. Wakeman has, ever since, for now some twenty years, been the unwavering law of this state.
The principle established by that case, was happily and forcibly stated by Judge Sutherland, who delivered the prevailing opinion of the court in Grover v. Wakeman; and it is manifest, from the report of the latter case, that it was the intention of that, the court of last resort, after full consideration, so to establish it. “It is time,” he says, “that some plain, simple, but comprehensive principle should be adopted and settled upon this subject. In the absence of a bankrupt law, the right of giving preferences, must, probably, be sustained. Let the embarrassed debtor, therefore, assign his property for the benefit of whom he pleases; but let the assignment be absolute and unconditional; let it contain no reservations or conditions for the benefit of the assignor; let it not extort from the fears and apprehensions of the creditors, or any of them, an absolute discharge of their debts, as the consideration for a partial dividend; let it not convert the debtor into a dispenser of alms to his own creditors; and above all, let it not put up his favor and bounty at auction, under the cover of a trust, to be bestowed upon the highest bidder. After the maturest reflection on this subject, I have come to the conclusion, that the interests, both "of debtor and creditor," as well as the general purposes of justice, would be promoted, if the question is still an open one, by confining these assignments to the simple and direct appropriation of the *481 property of the debtor to the payment of his debts. The remnants of many of these insolvent estates are now wasted in litigation, growing out of the complex or suspicious character of the provisions of these assignments. One device after another, to cover up the property for the benefit of the assignor, or to secure to him, either directly or indirectly, some unconscientious advantage, has, from time to time, been brought before our courts, and received condemnation. But new shifts and devices are still resorted to, and will continue to be so, until some principle is adopted upon the subject, so plain and simple, that honest debtors cannot mistake it, and fraudulent ones will be deterred from its violation, by the certainty of detection and defeat. The principle to which I have adverted, it appears to me, if adopted, will, to a very considerable extent, accomplish that object.”
I acknowledge the binding force of this decision, even in this, the court of last resort, and have ever felt myself constrained to obey it, when sitting in any inferior tribunal. And it is, perhaps, proper, that I should admit, that subsequent reflection and experience have tended to impress on my mind, the conviction of its entire propriety. I am disposed, therefore, to re-affirm it, in the broad and explicit language in which it was then announced. I have already had occasion to do so, at the special term of the supreme court, upon the same question now presented to us; and I am now persuaded, that there is no other rule that can be safely adopted, to prevent the innumerable frauds that are perpetrated, under the sanction, and in the name, of these voluntary assignments.
The great consideration that is urged in support of the clause, which is objected to, in this assignment, is, that the assignee must have some discretion as to the mode of selling the property, and that discretion may often warrant a sale on credit; that sales on credit are often expressly sanctioned by the statutes; and that, *482 therefore, it cannot be. improper, to confer, in terms, upon the assignee, the power which flows to him as a necessary incident of his position; or, in the language used in this regard, “ if the law says, that the authority, as necessary and beneficial, is given by implication, we shall not commit the absurdity of saying, that it is illegal and fraudulent, when given in terms.” Now, it seems to me, that this argument overlooks this important consideration, that sanctioning this clause, “when given in terms,” strips the creditor of his control over the property, and confers that control on the debtor.
When a debtor becomes insolvent, his property belongs, in equity, to his creditors, and not to him; and, thenceforth, the object and aim of the law is, to give it to his creditors. He has an interest, to see that it is not sacrificed or wasted, but is so managed as to pay as much of his debts as possible; this is the extent of his equitable interest; but it is subordinate to the rights of his creditors, which are, to have the property applied to the satisfaction of the debts, without fraud, hindrance or delay. That subordination is an inflexible principle of the law, save only where it is interfered with by the rule which sustains these voluntary assignments. It is in obedience to that principle, that the creditor has a right to resort to the courts, and to enforce the satisfaction of his claim, even at the expense of a forced sale and sacrifice of the debtor’s property. It is that which lies at the foundation of all bankrupt laws, and is interwoven into our insolvent laws. It is founded in justice, enacted into our statutes, and is necessary for the due protection of the immense mass of mercantile transactions which are continually accumulating around us. Yet it is invaded by the rule which sanctions voluntary assignments, a rule, having its origin, not in the statute, but in the decisions of our courts, and springing from the difficulties flowing from the absence of a general bankrupt law.
*483 A bankrupt law, that would take from the debtor the control of his property, when he became insolvent, and transfer it to his creditors, and to them all, and not to such one only as would press the hardest, would obviate all the difficulty;[4] but, in the absence of such a law, there is nothing to stay the progress of the vigilant creditor, but a voluntary assignment. How far that assignment shall go, and what shall be its provisions, and what its office, beyond the invasion of the subordination already spoken of, has been the dispute. It is already too well settled, for us now to shake, that it may also perform the office of preferring one creditor to another. Shall it go further? Shall it also give the debtor power to say to his creditor, “ you shall wait my pleasure for your pay; you shall abide my time, and not sell at your own, for the satisfaction of your just claim?” Because, if it may, it necessarily takes from the creditor the control of the mode and manner in which he shall coerce payment, and confers it upon the debtor, and the friendly assignee whom he may choose. And can any one say, that this is not hindering and delaying creditors ? Practically, it is so, reason Or refine upon it as we may; anything that interrupts the creditor in the lawful pursuit of his remedy through the courts, for the purpose of enforcing payment, hinders and delays him.
It may be said, however, that this strikes at the principle of voluntary assignments at all, and especially, at that which allows of preferences among creditors. Truly, it does seem so; yet, those two principles, whether they are exceptions or qualifications of the general rule, are far too well settled for me now to intend to disturb them. *484 The general rule is referred to, for the purpose of avowing the determination, at once, of adhering to it, and allowing no further exceptions or qualifications to it.
It is not difficult to see, how the creditor may be delayed and hindered by the clause in question. When he has obtained his judgment, he has a right to his execution, at once, and to a sale of the debtor’s property, within such time as the law allows. But the assignment takes away from him that right, and compels him to wait such time as the assignee may see fit, subject only to such control as the court may exercise over an unreasonable delay. If it be lawful to insert such a clause, then it will be lawful for the assignee to give a credit; and the only control the creditor can exercise, through the courts, will be over an unreasonable delay; while, without the clause, he may ask the courts to order a sale, without any delay. In one case, the delay will be in the exercise of a sound discretion, with which, the courts will not, for a slight cause, interfere; in the other, it will be an arbitrary act, and readily controlled. In one case, to give credit, and thereby cause delay, will be a part of his duty, written down for him; and in the other, it will not be allowed, without permission obtained. In one case, it will be at his option; and in the other, only by direction of the court, after notice to the parties in interest. In one case, he may consult the interest of the debtor, who has selected him; and in the other, he must consult that of the creditor, whose trustee he is. It will not be difficult, then, to see, how the rights and remedies of the creditor may be, in fact, affected, by legalizing this obnoxious clause; and, practically, we know, and have often seen, how it may be, and has been, used as a means to that end.
The suggestion, that credit on official sales is sometimes authorized by statute, does not strike me as having any application to the case in hand; for, it seems to me, there is some difference, whether an act is authorized by *485 statute, or not. And, if the fact, that a principle is adopted in a particular statute, is a ground for its universal application (and that seems to be the argument), then, the provision of the insolvent laws, forbidding preferences, would destroy all assignments of that character.
But it is unnecessary to dwell upon the other suggestions that were made on the argument. I have already stated the general principle, on which I regard this clause as illegal, and that is, in no wise, affected by those suggestions, for I look upon the clause as evidence of an intention to hinder and delay creditors, because such is the inevitable result of it; and we must infer “ that a man intends to do, what his deliberate conduct, plainly, distinctly, and inevitably, tends to accomplish.” It may very well be, that where the hindrance and delay is the necessary consequence of an act otherwise lawful in itself, that will not vitiate the deed; but where the intent and object is, to hinder and delay, though final payment is fully intended, such intent will render void the deed. The cases of Van Nest v. Yoe (1 Sandf. Ch. 4) is a striking illustration of the principle. See also, Ward v. Trotter (1 Monr. 1); Vernon v. Morton (8 Dana 247).
In all those cases, the ultimate dedication of all the debtor’s property to the payment of his debts, was provided for; but, in the meantime, the assignment was intended to prevent a sacrifice of it, by forced legal sales, and because of that intent, the instruments were held void. And rightly so, I think; and it was well said, in one of those cases — “It is no answer to say, that the debtor provides an ample fund for the payment of the debt, and that the creditor is ultimately to be paid in full; the law gives to the creditor the right to determine, whether his .debtor shall have further indulgence, or whether he will pursue his remedy for the collection of his debt.” It is this right which the clause in question would interfere with, and that interference is no more *486 lawful in one case than the other. It has always been considered objectionable, for the legislature to pass laws to stop or delay parties in the collection of their debts; to allow a party to make a stop-law of his own, is still more obnoxious to sound principle.
I am, therefore, of opinion, that the assignment is void, by reason of the clause which authorizes the assignee to sell the assigned property on a credit; and the judgment of the superior court ought to be reversed.
Judgment reversed.

 Hauselt v. Vilmar, 76 N. Y. 630: s. c. 11 J. & Sp. 574.

 This opinion was originally published in 10 N. Y. 591; it is here given in its proper place.

 This criticism was called forth by the mode in which Barney v. Griffin had been reported (the reporter having been himself the counsel of the unsuccessful party) ; and the remarks of Mr. Justice Duer, in the opinion of the court below (4 Sandf. 294) — “We should have doubted whether the statement of the reporter could have been regarded by us, had not satisfactory evidence been placed in our hands, since the hearing,” (by whom ?) “ that it was made upon the authority of Mr. Justice Bronson himself.”

 There is no more difficult task, than that of framing a satisfactory bankrupt law ; we have had three, in this century, all of which have been failures. The act of 1800 was framed in the interest of the creditor ; that of 1841, in the interest of the debtor; whilst the act of 1867 seems to have had in view the interests of no one but the federal officers who were to administer it.