### D. & J. AMES vs. BLUNT and others.

Although an assignment for the benefit of creditors is fraudulent as to those who do not assent to it, the assignees are not answerable for the proceeds of assigned property actually paid to bona fide creditors of the assignee, pursuant to the assignment, before any others have obtained either a legal or equitable lien on such property or the proceeds thereof.

But if the assigned property was such as might be seized and sold on any execution, it seems it might still be levied on in the hands of a purchaser from the assignees, provided he had either actual or constructive notice of the fraud at the time of his purchase.

THIS was an appeal from a decretal order of the vice chancellor of the first circuit.    In 1817 E. M. Blunt being in failing circumstances, made an assignment of his property for the benefit of his creditors, to William Hooker, and authorized the assignee to use the property in carrying on the business in which Blunt had previously been engaged.    Hooker continued the business until January, 1823, at which time he became insolvent.    He then, in conjunction with Blunt, made

an assignment of the property and effects of the establishment to the defendants, Burtis, Morgan and Bancker, in trust, to pay such assignees and certain other preferred creditors of the assignors, in the first place, and to distribute the residue of the proceeds of the assigned property to such of the other creditors as should consent to the assignment, and discharge the assignors from all further liability. At the time of this last assignment the assignors were indebted to the complainants, Blunt as the drawer and Hooker as the endorser, for the amount of a promissory note given in 1822. In the summer of 1827, separate judgments were recovered against Hooker and Blunt, for the amount due on the note; upon which judgments, executions against the property of the defendants therein respectively were issued and returned unsatisfied. And in October, 1827, the bill in this cause was filed, for the purpose of setting aside the assignment as fraudulent; and to obtain satisfaction of the complainants' debts out of the assigned property. To this bill the assignors and assignees, and Joseph Blunt and his two brothers who claimed a part of the property under a purchase from the assignees in 1826, were made defendants.

The following opinion was delivered by the vice chancellor, at the time of making the decretal order appealed from.

W. T. M'Coun, V. C. The complainants are judgment creditors of Edmund M. Blunt and William Hooker, on separate judgments against the former as maker, and the latter as endorser of a promissory note, made in April, 1822 ; one judgment was recovered on the 25th June, 1827, and the other on the 2d July, 1822, and writs of fi. fa. having been issued and returned nulla bona, the complainants, on the 17th of October, 1827, filed their bill in this court, praying a discovery of the property of their debtors in the hands of the defendants, Burtus, Morgan and Bancker, and of the defendants, Edmund, George and Joseph Blunt, under certain bills of sale and assignments made by Edmund M. Blunt and Hooker, and seeking to set aside the assignments as void against creditors. The first transfers of property alluded to, are certain bills of sale and

assignments of the personal estate of Edmund M. Blunt, made by him to William Hooker, on the 11th, 13th, and 15th days of December, 1817, some of them being absolute in their terms, as upon an actual sale of the property, and others upon trust for the payment of certain debts owing by Edmund M. Blunt; and after paying the debts, the surplus to be accounted for to him. The debt owing to the complainants was not, however, one of them, the same not being then contracted. Hooker assumed and held possession of the property embraced in the bills of sale and assignments, and conducted the same line of business which Mr. Blunt had pursued, and at the same place, for several years; until at length becoming himself embarrassed with debts, and among the rest the debt to the complainants having been contracted, he, on the 3d of January, 1823, made an assignment to the defendants, Burtis, Morgan and Bancker. In this assignment Edmund M. Blunt united as a party with Hooker. It recites that they were *severally* indebted to the parties of the second part, the assignees, and to other creditors, in divers sums of money specified in a schedule annexed; and the note on which the complainants afterwards recovered judgment, is one of the debts enumerated. It then purports to transfer and assign the stock in trade, personal property and effects of the parties of the first part, at their nautical and mathematical establishment, No. 202, Water street, in the city of New-York, or elsewhere, including their outstanding debts, bills, notes and book accounts. By the trusts declared in this assignment, the assignees were to convert the property into money, either at public auction or otherwise, at such time or times, and for such prices as they should judge expedient and most for the interest of all concerned; or if the assignees should judge it expedient and most for their interest to continue the said establishment, the assignors, for a reasonable compensation, were to attend to the different branches of the business, subject to the superintendence and direction of the assignees. And out of any moneys which should be realized, the assignees were in the first instance to pay the debts due or to become due to two preferred creditors named in the assignment, next to themselves the assignees respectively, and one other person. And after the full pay-

1834.

Ames
v.
Blunt.

ment of such debts, then the assignees were to make dividends of the residue among such of the remaining creditors of the assignors as should accede to the assignment, and discharge the assignors from all further liability. That after the final satisfaction and discharge of the debts thus provided for, the assignees should re-assign to the assignors whatever property, money or effects should then remain in their hands, and the assignment should thereafter be null and void. The assignees took upon themselves the duties and responsibilities of the assignment, conducted the business under it in their own names for three years and upwards, making large advances, and receiving the money arising from the sale and disposal of the stock. Finally, however, they determined to bring the business to a close, and therefore agreed to sell the whole of the stock, property and effects remaining on hand, to the defendant Joseph Blunt, for the sum of $14,300. And on the 14th of October, 1826, they accordingly executed to him a bill of sale of the property, taking from him some money, and some property in part payment, and his notes endorsed by his brothers George W. and Edmund, for the balance of the purchase money. Edmund and George W. became interested with him in the purchase, for the purpose of taking charge of the property and continuing the business with the stock thus acquired. Articles of agreement were at the same time entered into between the three brothers and their father, Edmund M. Blunt, providing for the conducting of the business under the superintendence and care of Edmund and George W. Blunt, and in their names, and securing to the concern the services of their father, as a compiler and publisher of nautical books and charts for a certain salary agreed to be allowed to him. After all this had taken place, and whilst the business was going on under that arrangement, the complainants prosecuted their suits at law upon the note against both maker and endorser, and recovered the judgments before mentioned ; and by the return of the executions unsatisfied and the filing of the bill in this cause, the complainants acquired an equitable lien upon any property, money or thing in action, which at that time belonged to either of the debtors in the hands of the other defendants in this cause. Whether there is any thing upon

1831.

Ames
v.
Blunt.

which such lien attached, necessarily involves an inquiry into the validity of the several assignments before mentioned, and the bona fides of those transactions.   With respect to the sale and assignments made by Edmund M. Blunt to Hooker, in December, 1817, I consider them entirely out of the question. Even admitting they were merely colorable, and the property those instruments purported to pass still to have been the property of E. M. Blunt, I cannot see how the complainants can derive any advantage from that circumstance.   They were not creditors at the time, and before they acquired any right to call the transaction in question, it was done away by the acts of the parties themselves, in making the subsequent assignment to Burtis, Morgan and Bancker; which was an assignment of substantially the same property, in which Blunt and Hooker united as if it was their joint property, and the object of which was to secure the debts owing by both. Whether the first was fraudulent or not is therefore immaterial; by the last the property was placed in the hands of third persons, and the complainants' debt had just then been contracted.   I think, therefore, the inquiry is limited to this last assignment, because here their rights as creditors, whatever they were, first attached.   The question then turns upon the validity of the assignment of January, 1823.   There is no evidence of its being fraudulent in fact.   On the contrary, there was a good and sufficient consideration to support it.   The assignees were respectively creditors, and there were other debts to a large amount for which it was necessary to provide, and which the assignees were induced to assume, in order to prevent a sacrifice of the property at forced sales.   Under these circumstances the assignment was made, and a preference was given to such debts as were already a charge upon the property, and to such as were owing or might become due to the assignees.   So far the assignment was unexceptionable, and I am satisfied no fraud was intended by the assignees. They appear to have acted throughout in good faith, and from honest motives; at least nothing is shown to the contrary. But I am nevertheless clearly of opinion the assignment was legally fraudulent, upon the face of it; and as such was void-

able, at the instance of any of the creditors, by reason of the condition upon which the creditors in general were to be permitted to participate in the dividends. Such a proviso or condition is now uniformly held to vitiate the whole instrument. But before any measures were taken to avoid the assignment, the assignees had proceeded to execute the trusts, so far at least as to sell the whole of the property. From January, 1823, to October, 1826, they were acting in the business of the assignment, carrying the trusts into effect, and every creditor apparently acquiescing, without any attempt to prevent them from so doing. It is therefore by the implied consent and permission of the creditors that the assignees went on and executed the trust, so far as the sale of the property is concerned, and a bona fide purchaser from the assignees would, under these circumstances, acquire a title which the creditors ought not now to be permitted to disturb or impeach.

The next question then is whether Joseph Blunt is a bona fide purchaser under the sale made to him in October, 1826. From a careful perusal of the answers of the defendants, and after an examination of the testimony in the cause, I am free to say that I have discovered nothing which goes to impeach the fairness of that transaction. It appears to have been entered into from good motives, and with honest and honorable views; the price he agreed to pay was the full value of the property, according to the evidence, and if sold at auction at that time, it would have produced only from eight to ten thousand dollars. The arrangement between Joseph Blunt and his brothers, under which they were to conduct the business, and by which they were to give their father employment, did not impair the sale, nor does it furnish any evidence of a fraudulent design. It was urged on the hearing that this was all a contrivance to re-possess Edmund M. Blunt of the property, and to enable him to resume the business without satisfying his creditors. But it must be recollected that when his sons took the property from the assignees, they substituted the full value of it in money and securities, for the benefit of the creditors, and that Edmund M. Blunt did not join in giving the notes or securities. His sons made the payments and gave the notes upon their own responsibility; and such as have not

1834.

Ames
v.
Blunt.

been paid, they are still liable to pay. Even if Edmund M. Blunt had any latent interest in the property, the result has shewn that it was worthless ; for upon a sale of the whole in April, 1829, after public notice, and a fair exposure at auction, it produced short of $10,000, although, according to the evidence, there had been an augmentation of the stock, and a consequent increase of its value. Instead, therefore, of any thing beyond the cost, to which Edmund M. Blunt could be entitled, there was a large deficiency. It is important to notice this sale only in that one point of view. But again, it does not appear that Edmund M. Blunt had any interest in the property under the agreement with his sons, except a mere contingent and uncertain interest, founded upon the gratuitous offer of his son Joseph Blunt, that he should participate in his share of the profits upon the final settlement of the concern ; which has never become a vested interest of any value, and, as far as I am able to judge of it, is now at an end.

Upon the whole, there are no grounds upon which, in my judgment, I can decree an account against the defendants, Joseph Blunt, Edmund Blunt and George W. Blunt, in relation to the property purchased of the assignees in October, 1826, or the business which they have pursued since, by reason of any supposed or latent interest of their father in such property or business ; and I shall not, therefore, direct any such account to be taken in favor of the complainants. There is, however, another branch of this case, in relation to which I think the complainants are entitled to an account. They acquired an equitable lien upon any property, money or things in action which belonged to either of their debtors, at the time of filing their bill in this cause. I have already remarked that the assignment made to Burtis, Morgan and Bancker was voidable. And so far as the trusts created by that assignment were not executed at the time of filing the bill, the property, or any of its proceeds, then remaining in the hands of the assignees, must be considered as belonging to the assignors; and from that moment liable to satify the debt owing to the complainants, in preference to all others, by reason of their superior diligence in prosecuting to judgment and execution. But so far as the trusts were executed, and for every thing the assignees had

actually done under the assignment, I shall hold them harmless.   The absence of any proof of actual or intentional fraud on their part, and the great delay of the creditors in seeking to avoid the assignment, suffering the assignees to go on during all that time without objection, I think, warrants me in extending to them the protection of this court, for all ·advances made whilst they had the property in their possession ; so far as the receipts from the business and from the proceeds of the property sold were actually applied to the reimbursement of such advances, and to the payment of the moneys owing to themselves and the other preferred creditors, before the filing the complainants' bill.

As regards the sale to Joseph Blunt, I have already considered that an executed trust, before the filing of the bill, and therefore not to be disturbed.   But with respect to the purchase money of $14,300, so far as that or the securities for it remained in the hands of the assignees as trust property, not actually applied to the payment of their own or other creditors' debts, the complainants' lien would attach.   An account must therefore be taken of that money, and of all other moneys received or to be received ·by the assignees, from or out of the assigned property ; for the purpose of ascertaining the amount in the hands of the assignees, or either of them, at the time of filing the complainants' bill, out of which their judgments at law can be satisfied.

In extending protection to the assignees, in the present case, for every thing done and executed by them before the complainants' right accrued, I must not be considered as impugning the.doctrine that when an assignment is found to be fraudulent and void, by reason of some particular clause or provision contained in it, it shall be set aside entirely.   And that the trustees, although creditors, shall not be permitted to retain any part of the property for the purpose of setting off their own debt, or of paying themselves, in preference to other creditors ; but shall account for all that comes into their hands under such an assignment.   This is undoubtedly a salutary and wholesome doctrine, and as such was adopted and enforced by Chancellor Kent, in *Riggs* v. *Murray,* (2 *John. Ch. Rep.* 565,) and has been recognized in all the leading cases on the subject of

fraudulent assignments in our own courts; and also in *Harris* v. *Sumner*, (2 *Pick.* 129,) and *Halsey* v. *Whitney*, (4 *Mason*, 206,) where all the cases, English and American, are examined by Justice Story.

It will be perceived, however, that all these were cases where the trusts remained executory, and where the property assigned was levied upon, by execution or attachment, in the hands of the assignee, or its proceeds reached by bill and injunction, before a final appropriation to the objects of the assignment. And I think a just distinction may be drawn between such cases, and those in which the trusts have been carried into effect, previous to any attempt made by the creditors to set aside the assignment; especially where they have had sufficient time and opportunity, and have neglected to proceed. The present case ought at any rate to form an exception; for here four years and upwards were suffered to elapse, after the assignment in question was made, before the complainants undertook to prosecute either their legal or equitable rights, and no reason is assigned for the delay. It would be unjust, and might operate most injuriously, were the assignees at this late day to be required to undo all that had been done under the assignment, and to be thrown back, even upon an equality with all the other creditors; when at the same time the complainants are not seeking to put themselves upon that equality, but to obtain a preference of payment in full of their demand. I must therefore say, as was said by the court in *Haggerty* v. *Palmer*, (6 *John. Ch. Rep.* 438,) that if the proceeds have been actually appropriated by the assignees before the commencement of this suit, the remedy as to such proceeds is gone.

The reference must take place as between the complainants and the assignees, Burtis, Morgan and Bancker, and the account must be taken upon the principles here stated; and until the coming in of the master's report I shall reserve all further questions, even as to the costs of the other defendants.

*D. Graham, jun.*, for the complainants.

*B. F. Butter & J. Blunt*, for the defendants.

THE CHANCELLOR. The vice chancellor was right in re-fusing to go into an inquiry whether the assignment of 1817 was not fraudulent as respected the creditors of E. M. Blunt. It was valid as between the parties thereto; and as the complainants were not then creditors, it could not have been made to defraud them. Those who were then creditors, had a right to elect to take the provision made for them by the as-signment, even conceding it to have been fraudulent. And they have a prior equity to be paid out of the property then assigned, or the proceeds thereof, if it can now be traced and identified, although it may have passed into the hands of the new assignees, for the benefit of other creditors. And if there are no creditors having such prior claims, then the rights of the complainants are the same, whether the first as-signment was or was not fraudulent; as their judgments are against both the assignor and the assignee in that as-signment.

Since the decree of the vice chancellor was made in this cause, the case of *Grover* v. *Wakeman*, (11 *Wendell*, 187,) has been passed upon by the court of dernier resort. It cannot therefore be any longer doubted that the decision of the vice chancellor was correct, in declaring the last assignment fraud-ulent and void as against the creditors of the assignors; as those creditors could never get any part of the assigned prop-erty without submitting to the terms imposed, of giving up all *further claims* against their debtors. But the vice chan-cellor has done what this court did in the case of *Wakeman* v. *Grover*—refused to charge the assignees with that part of the proceeds of the assigned property which had been paid over to the preferred creditors, or distributed among them, previous to the filing of the complainants' bill. And, in reference to this question, a distinction is now attempted to be taken be-tween an assignment fraudulent in law merely, and an as-signment which is fraudulent in fact. The distinction be-tween what is now called fraud in law, and that which is de-nominated by the counsel fraud in fact, appears to be that in the first case it is apparent from the terms of the assignment itself that the parties intended to do an act the legal effect of which would be to defraud the creditors, and that in the oth-

er the assignment upon its face is legal, but the fraudulent intent is made out from extrinsic evidence. Without stopping to inquire whether there is any real difference between the two cases, except as to the nature of evidence by which the fraud is established, I must be permitted to say that I do not think the question, whether the assignees are to be charged with what they have distributed among the honest creditors, before the complainants had obtained either a legal or an equitable lien upon the property, depends upon any such distinction. It certainly would afford no protection to a person claiming as a bona fide purchaser of real estate, under a deed or assignment which was fraudulent on its face, to insist that he was ignorant of the principle of law which rendered it fraudulent. The law presumes that every man is aware of the legal consequences of his own voluntary acts; although such may not always be the case in point of fact. And, acting upon that presumption, courts are not guilty of the absurdity of considering an act honest and fair as regards the rights of creditors, when at the same moment they are bound to consider the act itself as illegal and fraudulent. The validity of the assignment depends upon the intention of the parties to commit or not to commit a fraud, presuming that they are aware of the legal consequences of that which they intend to do. I apprehend, therefore, that the liability of the assignees, for the proceeds of the assigned property which have been distributed to the bona fide creditors under the assignment, must depend upon the question whether the legal or equitable rights of the complainants have been impaired or affected by such distribution. In other words, whether they have been in fact defrauded thereby. The principle, then, upon which the decision of this court in *Wakeman* v. *Grover* and of the vice chancellor in the present case is sustainable, is, that the proceeds of the assigned property had been distributed, according to the directions of the assignors, in payment of bona fide creditors; to whom such proceeds might have been lawfully distributed by the assignors themselves at any time before the complainants had obtained any legal or equitable lien thereon; and therefore that the complainants have not been defrauded or injured by such distribution. But if the

assigned property, or the proceeds thereof, had remained in the hands of the assignees, undistributed, at the time of filing the bill, which would have given to the complainants a lien thereon as the property of their debtor, the assignment being voidable by them at that time, it would be a fraud upon their rights to distribute the proceeds afterwards. The decree of the vice chancellor, therefore, appears to afford to the complainants all the relief to which they are entitled in such a case. No part of the assigned property remained in the hands of the assignees, in specie, at the time the complainants' executions were issued; as it had all been sold to J. Blunt for its full value before that time. The remedy of the complainants, so far as the assignees were concerned, is therefore against the proceeds remaining undistributed among the bona fide creditors at the time of filing the complainants' bill.

If the assigned property had been in the hands of J. Blunt undisposed of at the time the complainants' executions issued, it might be necessary to inquire whether he could be considered a bona fide purchaser, so as to defeat the lien of those executions; inasmuch as he claimed through or under an assignment, which was fraudulent on its face. I am inclined to think the property would in that case have been liable to the lien of the executions, and might have been sold under the same. It does not appear, however, that any part of the assigned property, which was the proper subject of a seisure and sale on execution, remained undisposed of at that time. And even if that fact did appear, it still would be doubtful whether the lien of the executions was not lost by returning the same unsatisfied, without any attempt to make a levy. (See Opinion of Mr. Justice Nelson, 9 Wendell's Rep. 561.) The price paid by Joseph Blunt, for the property on hand at the time he purchased, was the full value thereof. So much of the purchase money therefore as had been paid to the assignees, or applied to the payment of bona fide debts before the filing of the complainants' bill, ought not, in justice and equity, to be charged upon him the second time; and so much thereof as remained then undistributed is already provided for in the account which is directed to be taken. If any of his notes were unpaid at the time of filing of the complain-

ants' bill, and had not been turned out in payment of bona fide creditors previous to that time, the amount thereof will appear from the account which has already been directed; and provision may be made in the final decree, making him liable over to the complainants, if the assignees should be found to be insolvent, so that the amount could not be collected of them. I presume he has not paid the notes to any other than a bona fide holder, since the commencement of this suit, without requiring an adequate indemnity. The whole value of the property sold to him being thus disposed of, it would be a useless expense to take an account for the mere purpose of attempting to trace the proceeds of that part of the property. And from the manner in which the business has been subsequently transacted, it would probably be impossible to take any thing like a correct account of such proceeds.

As there was no fraud in the sale of the property to Joseph Blunt, he having purchased for the full value, and the proceeds being all applied to pay bona fide creditors, I cannot see any thing objectionable in the arrangement he subsequently made with his father and brothers to endeavor to turn the property into cash, and at the same time to furnish his father with the means of livelihood. Even if he had given the whole of this property to his father, or had secured the use of the whole to him in such a manner as to protect it against the claims of creditors, it would be far from furnishing any evidence of fraud. Whatever frauds upon his creditors the father may have been guilty of, it cannot be a fraud in the son to pay the full value of the property out of his own funds for their benefit, and then to insure his parent a maintenance out of the property thus acquired.

I think the vice chancellor has in this decretal order done all that was necessary or proper to be done, in this stage of the cause, to protect the rights of the complainant against the fraudulent assignment of January, 1823; and that there is nothing in the decree which requires to be altered or modified. The decree or order appealed from must therefore be affirmed, with costs.