## SMITH and others *v.* CRAFT and others.*

*(Circuit Court, D. Indiana.   July 27, 1882.)*

1. PREFERENCE—RIGHT OF INSOLVENT DEBTOR TO MAKE, AND HOW IT MAY BE MADE.

    An insolvent debtor, in the absence of the bankrupt law, has the absolute control of his unencumbered property, and he may prefer one creditor to the exclusion of all others. The favored creditor's debt may or may not be due, and the preference may be by a judgment, a mortgage, a deed, a transfer of securities, or choses in action, the sale of personal property, or the payment of money.

2. SAME—CONDITIONS AND LIMITATIONS AS TO THE RIGHT.

    While the motive which prompts the debtor to make the preference is *not* material, the transfer, to be valid, must be in good faith, and in payment of an honest debt; the debtor cannot make a preference on such terms as he pleases. The preference must be absolute and unconditional, and without designs to secure to the debtor any personal benefit as against his non-preferred creditors, or to hinder or delay them in the collection of their debts. Equity favors an equal distribution of a debtor's property among all his creditors, and conditional preferences will not be sustained; *e. g.*, where the preference is the transfer of an entire stock of goods to a single creditor, conditioned on the employment of the debtor, by the preferred creditor, at a fixed monthly salary, as the creditor's agent and superintendent in continuing and carrying on the business formerly conducted by the debtor for himself, *it is invalid* because of such condition.

*Horace Speed*, for complainants.

*Rand & Taylor* and *Baker, Hord & Hendricks*, for respondents.

GRESHAM, D. J.   The defendant Craft, who was a merchant at Indianapolis, on the fifth of April, 1879, executed to his co-defendant, Churchman, in trust for Fletcher & Churchman, a bill of sale embracing his entire stock of watches, diamonds, jewelry and fixtures; also a lease upon the building in which he had carried on his business, one year of the term not having then expired. This was all the property that Craft owned, except his notes and accounts, which he estimated to be worth $1,000, and some real estate, which was encumbered for as much as it was worth. Fletcher & Churchman were bankers, and as such at different times had loaned money to Craft, on his agreement that if they would make the loans, and anything occurred by which he was unable to pay all his creditors, he would first pay or secure them. It is recited in the bill of sale that Craft is indebted to the bank in about the sum of $31,000, and that the sale is made in payment and satisfaction of this indebtedness, "and the further consideration that said Churchman shall em-

*Reported by Charles H. McCarer, Asst. U. S. Atty.

ploy said Craft in said business, at the rate of $150 per month, so long as said Churchman shall carry on or continue said business."

Immediately after the execution of this instrument, Craft's employes were notified by Churchman and Craft of the sale, and that thereafter the business would be carried on by Craft as the agent of Fletcher & Churchman. After this change, Craft conducted the business as agent, with his old force of employes, just as before the transfer, until some time in August, when, by direction of Fletcher & Churchman, he commenced selling the remainder of the goods at auction, and in this way the stock was finally disposed of some time in October. During the time that Craft managed the business he paid himself and his co-employes weekly out of the proceeds.

The complainants, the Middleton Plate Company, Keller & Untermeier, William Smith & Co., and Freund & Co., are eastern merchants and manufacturers, with whom Craft had been dealing for many years, and to whom he was indebted for goods purchased prior to the sale to Fletcher & Churchman. After the sale, and before the commencement of this suit, on the twenty-seventh of June, 1881, the complainants obtained judgments against Craft for the amounts respectively due them, upon which executions issued and returns were made of no property.

The bill charges that the goods which the complainants sold to Craft on time, and for which their several judgments were taken, were part of the stock sold to Fletcher & Churchman; that they divided the proceeds with Craft, and that the transfer was intended by both Craft and Fletcher & Churchman to hinder and delay the complainants and the other creditors of Craft.

Fletcher & Churchman, in their answer, deny all fraud, and aver that on the twenty-seventh of December, 1878, Craft was indebted to them in the sum of $25,000, for which he gave his two notes, each for $12,500, payable in 30 and 60 days, and in the further sum of $7,313, that being the amount paid by them for Craft, at his request, in taking up a note which he had previously given to George F. McGinnis; that the sale by Craft to them was in good faith, and in full payment of his indebtedness; that they realized not more than $20,000 from the goods; that Craft got no part of the proceeds; that they have no knowledge that any of the goods purchased of either of complainants were in the stock at the time of the transfer; and that the sale to them was in good faith, as preferred creditors, with no intention of cheating, hindering, or delaying the complainants or other creditors.

Craft s answer denies that he received any part of the proceeds; denies all fraud; and avers that the sale was in good faith, in payment of an indebtedness which exceeded the value of the goods and fixtures and the unexpired lease.

Craft's credit seems to have been good with the complainants up to time of his failure, and yet it appears from the evidence that he was insolvent early in 1878. The judgments taken by the complainants were for goods sold after this time, and mostly within a few months before the sale to Fletcher & Churchman. The last purchase from Keller & Untermeier, amounting to $876, was as late as the twenty-sixth of March, and only 10 days before the transfer. It is probable that these goods were part of the stock sold to Fletcher & Churchman. That they got some of the goods purchased from the complainants, which had not been paid for, is clear enough. Craft swears that in the spring of 1878, and from that time until his final failure, he had the confidence of a sanguine business man that he would be able to keep up and pay all his debts, and I am satisfied that during this period he made payments to the complainants.

Fletcher & Churchman had been accommodating Craft with loans for a number of years. Churchman testifies that Craft always promised if the loans were made, and from any cause he was unable to pay all his debts, he would protect or secure Fletcher & Churchman. The loans made from time to time (on faith of these promises, it is to be presumed) amounted, in August, 1877, to as much as $20,000. These loans, and others made after that time, were regularly renewed every 90 days, and the interest paid in advance at the rate of 10 per cent. per annum, until the notes were given, which matured on the twenty-seventh of December, 1878. At this time Craft's indebtedness from loans, both he and Churchman say, amounted to $25,000, for which Craft gave his two notes for $12,500, payable in 30 and 60 days, instead of 90 days, as in all former renewals. About this time, and perhaps the same day, Fletcher & Churchman paid for Craft the McGinnis note, which was indorsed by Churchman. Instead of taking Craft's note for the amount thus paid for him, Fletcher & Churchman simply held the cancelled note as evidence of its payment by them. Prior to December 27, 1878, Craft had always been required to renew his notes promptly at maturity. The two notes given on this day became due in 30 and 60 days, as already stated, and they were allowed to remain due without renewal until the sale, on the fifth of April. Craft is not able to explain why Fletcher & Churchman required those notes to be made in 30 and 60 days,

instead of 90 days, as in all former renewals, but supposes they had their own reasons for the change. He was not asked to renew these notes when they became due, and he requested no delay. But after thus testifying he says he thinks Fletcher & Churchman were waiting for him to make his annual invoice, on the first of April, before renewing again. Churchman testifies that when these notes were executed, on the twenty-seventh of December, he was anxious to have the indebtedness reduced; that Craft said he would cease buying goods, and he had no doubt he could fix the notes up in 30 or 60 days, or sell enough goods in that time to reduce the amount he was owing; and that when these notes became due he told Craft to let them stand, as they were in the hope that his sales would yet justify him in making some payments. Churchman gives no other reason for the change of time in the renewals, or for allowing them to stand after maturity until the transfer.

Craft completed his invoice on the first of April, which showed that his stock and fixtures amounted to "somewhere in the neighborhood of $33,000," exclusive of notes and accounts, which were estimated at "about $1,000." Recognizing that he was in "deep water," he went to the office of his counsel on the fifth of April and directed him to make out papers for an assignment. Just what was done under this direction does not appear; but, instead of making an assignment, Churchman was sent for, and arriving, was told that Craft had finished his inventory, could not pay all his debts, and was undecided as to what he had better do. Churchman then reminded Craft of his repeated promises, when he got the money from time to time, that if if he failed and became unable to pay all his debts, he would secure or prefer Fletcher & Churchman. Craft admitted that he had made these promises, and there and then the bill of sale was prepared and executed. Churchman's information was, he says, that Craft was solvent, and he knew nothing to the contrary until he was sent for when the transfer was made. Craft testifies that it was made because Fletcher & Churchman had been his friends, and he felt it to be his duty to prefer them. Both Craft and Churchman testify that the sale was in good faith, in payment of an honest debt, amounting to more than the property was worth. Neither Craft nor Churchman produced the inventory, and in speaking of it, Craft says it amounted to "somewhere in the neighborhood of $33,000," and Churchman says it amounted to "about $30,000." It does not appear from the evidence that Churchman saw the invoice before the transfer. It is not stated at what price the goods were invoiced; and although Craft deposited

the proceeds daily with Fletcher & Churchman, and they kept an account with the store, neither witness is definite in speaking of the total or net amounts realized. They both think the net amount was "about $20,000." Craft is not able even to approximate the proportion of goods sold before the auction sales commenced in August, but thinks that probably half of the stock was thus disposed it; and he is unable to tell what the auction sales amounted to, or at what reduction, if any, on the cost price the goods were sold. There is no evidence as to the value of the lease.

While I have no doubt that Craft was indebted to Fletcher & Churhman, the true amount that was owing does not clearly appear from the pleadings and the evidence. It is true, both Craft and Churchman state that the McGinnis note of $7,313, with accrued interest from date, and the two $12,500 notes, and interest after maturity, represented the true amount owing at the time of the transfer. But one of the special interrogatories required the respondents to state the amount of the indebtedness discharged by the sale, and the date and amount of each loan, if any were made, with date and amount of each renewal. In answer to this interrogatory Craft says that at the time of the sale he owed the two $12,500 notes and the McGinnis note, with the interest due on these notes. Although directly interrogated as to the original loans, their amounts, dates, and renewals, the answer is silent on that subject. Churchman's answer to the same interrogatory, though in different language, is the same as Craft's. These answers were not prepared by the same counsel, and it is somewhat singular, to say the least, that both should be silent on the same point. While testifying before the master, in answer to substantially the same inquiry, Craft says he got $7,000 November 17, 1876; $6,000 in February, 1877; $2,500 August 15, 1877; and $6,500 October 23, 1877. These loans, amounting to $22,000, are all that Craft is able to specify; but he says that sometimes he went into the bank and got loans which were not entered, and that he thinks he got $3,000 at some other time, as the total loans amounted to $25,000. Craft and Churchman are the only witnesses that testified, and they were called by the complainants.

An insolvent debtor, in the absence of a bankrupt law, has the absolute control of his unencumbered property, and he may prefer one creditor to the exclusion of all others. The favored creditor's debt may or may not be due, and the preference may be by a judgment, a mortgage, a deed, a transfer of securities or choses in action, the sale of personal property, or the payment of money. While the

motive which prompts the debtor thus to favor a single creditor is not material, the transfer, to be valid, must be in good faith and solely in payment of an honest debt. There must be no design to secure an advantage to the debtor over his other creditors, or to delay them in the collection of their debts. It does not follow that because a debtor may prefer such creditor or creditors as he pleases, that he may prefer them on such terms as he pleases. *Grover* v. *Wakeman*, 11 Wend. 222.

Equity favors an equal distribution of a debtor's property among all his creditors, and it does not view with favor a transaction whereby a single creditor is preferred to the exclusion of all others.

Craft and Churchman are vague and indefinite, when they should be certain and definite. They should state the different loans, specifying dates and amounts, including renewals, which constitute the two $12,500 notes, the exact amount of the invoice, the amount realized from the goods, both before and after the auction sales commenced, and the gross and net amounts realized from all sales. Craft had been insolvent for a year and a half, and perhaps longer, before the twenty-seventh of December, 1878. Churchman testifies that on the seventh of August, 1877, Craft's loans amounted to $20,000, after which time he paid the interest, but nothing on the principal. The two $12,500 notes were the first and only renewals that were permitted to stand after maturity. After these notes were given, on the twenty-seventh of December, 1878, and after they became due, Craft continued to buy goods from the complainants on credit, part of which were in the stock at the time of the transfer.

Without saying that it was in the minds of Fletcher & Churchman and Craft, at the time the last renewals were given, or at any other time, that the latter should get goods east on credit and turn them over to the former in payment of their debt, I think the preference was fraudulent on other grounds. Fletcher & Churchman loaned money to Craft on the faith of his agreement to secure them to the exclusion of all others, if he became insolvent. The complainants, ignorant of these agreements, sold Craft goods on time, trusting to his skill, energy, and integrity. They would not have done this, it is safe to assume, if they had known of the agreements to prefer Fletcher & Churchman at all hazards. These agreements were in the nature of secret liens, which the law will not allow to be enforced against Craft's other creditors. Fletcher & Churchman seem to have been on friendly and confidential relations with Craft, and I have no doubt they knew he was buying goods east on time, after the last

renewals were given as well as before. They assisted him in maintaining a credit to which he was not entitled, and now claim the proceeds of the entire stock against the injured and deluded creditors. If the right of preference may be exercised as the parties exercised it in this case, the law affords ample opportunity for a failing debtor to get the property of one person and use it in paying the debt of another. *Grover* v. *Wakeman, supra; Boardman* v. *Holliday*, 10 Paige, 222; *Riggs* v. *Murray*, 2 Johns. Ch. 565; *Nicholson* v. *Leavitt*, 4 Sandf. 252.

A further objection to the sale is that the property was not taken absolutely and unconditionally in payment of Fletcher & Churchman's debt, as a preference. It was a scheme, in part at least, to secure to Craft a personal benefit against his other creditors. Fletcher & Churchman got the lease, and they were to continue the business at the old stand, and, as part of the consideration of the transfer, Craft was to be employed as their agent and superintendent, at a salary of $150 per month for an indefinite period. During the seven months that he acted as agent he received $1,050 out of the proceeds of the stock for wages. Why this agreement in advance to employ Craft at a fixed salary, unless he was unwilling to make the preference on any other terms? If he exacted these terms as the condition on which he would make the sale, it was clearly not made for the honest and sole purpose of paying Fletcher & Churchman. It is evident that Craft bargained for and secured a personal benefit or advantage over the complainants while some of the goods which they had sold him on credit were yet on hand as part of the stock, or that Fletcher & Churchman tempted him to make the preference by offering to employ him as stated. If the employment of Craft had been subsequent to the sale instead of before it, and part of the consideration of it, and the preference had been otherwise free from objection, other creditors would have had no right to complain, for they would have sustained no legal injury. If it be admitted—and I do not think it can—that an insolvent debtor may make the best arrangement in his power with his creditors, preferring those who offer the best terms, then all creditors should have a chance to bid for the assets.

It is urged for Fletcher & Churchman (1) that, admitting the sale to them to have been fraudulent in fact, the proceeds have been applied as a preference in payment of an honest debt, and equity will not interfere; and (2) that the sale being at most only constructively fraudulent, they had a right to hold the property as a security for their debt, and therefore they were entitled to the proceeds. The first

of these propositions is unsound, both in law and in morals. One or more creditors of an insolvent debtor are not allowed to take his property by a fraudulent arrangement, convert it into money, and, because the debtor had a right to make an honest preference, defy the other creditors. If a debtor make a voluntary assignment, which is afterwards set aside as fraudulent, the acts of the assignee performed in good faith, in the execution of the trust, will not be disturbed. He will not be held to account for the property or its proceeds which have been paid out by him in good faith to the creditors. This is the law whether the assignment be fraudulent in fact, or only constructively so. *Grover* v. *Wakeman,* 4 Paige, 23; *Amos* v. *Blunt,* 5 Paige, 13. And when a sale is not tainted with actual fraud, but is fraudulent merely by construction of law, it is sometimes allowed to stand as a security for the grantee or vendee. *Tripp* v. *Vincent,* 8 Paige, 176; *Weeden* v. *Hawes,* 10 Conn. 50; Bump, Fraud. Cont. 597. But when a fraudulent scheme or purchase, by which a creditor gets the property of an insolvent debtor, is set aside in a suit brought by another creditor against the fraudulent grantee or vendee, he will not be allowed to share with the plaintiff the proceeds of the property. *Wilson* v. *Horr,* 15 Iowa, 489; *Riggs* v. *Murray,* 2 Johns. Ch. 565; *Harris* v. *Sumner,* 2 Pick. 129.

No general rule can be laid down, applicable to all cases of fraudulent sales, assignments, and preferences. The relief granted in a given case depends largely on the facts of that case. "Equity," say the court in *Clement* v. *Moore,* 6 Wall. 312, "looks at all the facts, and, giving to each its due weight, deals with the subject before it according to its own ideas of right and justice. In some instances it visits the buyer with the same consequences which would have followed in a court of law." The complainants, before bringing this suit, obtained judgments on their claims against Craft, and executions were issued, upon which there were returns of no property. If the property had remained in the hands of the respondent until the bill was filed, the complainants would have acquired a lien on it to the exclusion of other creditors, and they had a right to pursue the proceeds in Fletcher & Churchman's hands with the same result. The aggregate amount of the judgments is less than $20,000, and Fletcher & Churchman admit that they realized as much from the goods.

I hold, on the facts in the case, that the complainants are entitled to a decree against Fletcher & Churchman for the full amount of their judgments.

Since the court's finding announced for the complainants, other creditors have asked to be made parties to the suit as co-complainants. This may be done, but these creditors will be postponed in favor of complainants. *Weed* v. *Pierce*, 9 Cow. 722.